VOLUME I
PAGES 1-214
EXHIBITS 15-16

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 07-10908-JLT

H. MARK WHITE, et. al.   )
                         )
    Plaintiffs,          )
                         )
    vs.                  )
                         )
THE FESSENDEN SCHOOL, et. al.,  )
                         )
    Defendants.         )

DEPOSITION OF RUKHSANA NELSON, taken pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Deborah S. Gutierrez, a Registered Professional Reporter, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Tucker, Heifetz & Saltzman, 100 Franklin Street, Boston, Massachusetts, on Wednesday, January 9, 2008, commencing at 9:13 a.m.

- - - -

BRAMANTI & LYONS COURT REPORTING, INC.
REGISTERED PROFESSIONAL REPORTERS
92 State Street, 8th Floor
Boston, MA  02109
TEL: 617.723.7321  /  FAX: 617.723.7322

Page 82

```
 1    A    Um... I just didn't --
 2    Q    Okay.
 3    A    -- do it.
 4    Q    Were you being instructed by anyone to
 5         bring any strategies to Henry in your
 6         second grade classroom that you were not
 7         bringing to any other children?
 8    A    No.
 9    Q    Okay.  Were you bring any strategies to
10         Henry in the second grade classroom that
11         you were not bringing to any other
12         children in the classroom?
13    A    The constant one-on-one attention that I
14         was bringing to him and not other
15         children in the classroom.
16    Q    None other -- no other children?
17    A    No.
18    Q    What about the McGrath child?
19              MR. SCAMBY:  Objection.
20    Q    Was the McGrath child --
21    A    I don't know --
22    Q    -- classroom?
23    A    -- who that is.
24    Q    What about Latessa or Devoy?
```

Page 32

1  given time to help strategize what a
2  teacher may have previously identified
3  by notification to the psychologist as a
4  problem that might need being addressed
5  through additional services. Fair
6  statement?
7  A  Yes.
8  Q  So it was akin to an IEP team that you
9     had experienced in the public school
10    setting.
11 A  Yes.
12 Q  In fact, you had at some point in your
13    career there looked at the handbooks for
14    Fessenden, had you not?
15 A  Yes.
16 Q  And you had seen in there that they had
17    an expressed commitment in that handbook
18    to dealing with children with
19    differences --
20 A  Yes.
21 Q  -- and disabilities.
22 A  Yes.
23 Q  And wherever possible trying to cater to
24    their educational needs to the extent

Page 33

1  they were able to do so. Is that a fair
2  statement?
3  A  Yes.
4  Q  And that was what you understood to be
5     the philosophy at the school. It wasn't
6     just there for kids that didn't need
7     outside assistance. Correct?
8  A  Yes.
9  Q  They were committed to all their
10    enrollees --
11 A  Yes.
12 Q  -- in making them successful at
13    Fessenden.
14 A  Correct.
15 Q  That was the philosophy, was it not?
16 A  Yes.
17 Q  And didn't you feel as a teacher that
18    that was the commitment you were
19    supposed to bring to the classroom?
20 A  Yes.
21 Q  Okay. This process, then, if a teacher
22    identified -- by the way, in your
23    experience, correct me if I'm wrong, and
24    I'm not meaning to be exhaustive here

Page 34

1  but correct me if I'm wrong, the kinds
2  of triggers that could lead a teacher to
3  maybe want to fill one of those forms
4  out, get the psychologist involved in
5  order to have group think determine
6  whether anything additional was needed
7  for the child could be behavioral
8  issues.
9  A  Yes.
10 Q  Medical issues.
11 A  Yes.
12 Q  Emotional issues --
13 A  Yes.
14 Q  -- to the extent those are
15 differentiatable from behavioral.
16 A  Yes.
17 Q  Socialization issues.
18 A  Yes.
19 Q  Testing issues.
20 A  Yes.
21 Q  Classroom performance issues.
22 A  Yes.
23 Q  Attention issues.
24 A  Yes.

Page 35

1  Q  And I've just probably hit the major
2  ones that a layman would look at.
3  Correct?
4  A  Yes.
5  Q  There could be others.
6  A  Correct.
7  Q  There could be trending issues you see
8  in the progress of the child in the
9  classroom --
10 A  Yes.
11 Q  -- that might trigger that.
12       There could also be things
13 you're not currently seeing in your
14 classroom but by virtue of your
15 knowledge of the prior educational
16 history of the child leads you to
17 believe there's a trend that is
18 warranted looking into by the SST.
19 True?
20 A  Yes.
21 Q  And all of that comports with actual
22 experience you had as a special
23 education environment teacher in your
24 public school settings, correct?

Page 36

1  A  Yes.
2  Q  And it also comports with what you were
3  taught educationally is what I would
4  consider to be a fairly cutting edge
5  teacher having come out fairly recently
6  from school.  Fair statement?
7  A  Yes.
8  Q  Okay.  And you had already how many
9  years of experience in going through
10 exactly that kind of detection process
11 in determining whether kids needed to be
12 assessed for special education or
13 additional educational services?  How
14 many years had you had as an experienced
15 teacher doing that before you came to
16 Fessenden?
17 A  Four.
18 Q  In the public school setting in
19 Michigan, I'm sorry, in Massachusetts,
20 how many years does it take at one
21 school district before you're tenured?
22 A  Three years.
23 Q  Did you make tenure at either of the
24 public schools you were at?

```
 1    working to achieve this goal, needs to
 2    work on this goal? Did anybody ever
 3    explain to you whether those had any
 4    particular meaning beyond their evident
 5    linguistic meaning at Fessenden?
 6  A No.
 7  Q Did anyone ever tell you that a certain
 8    amount of checkmarks in a certain one of
 9    these columns is going to result in a
10    certain kind of action with respect to
11    any kind of student?
12  A No.
13  Q What I guess I'm driving at is, was it
14    left to each teacher to decide on the
15    basis of his or her own determinations
16    on these forms as to whether or not what
17    they were seeing in the child
18    necessitated some sort of additional
19    intervention in the child's education?
20  A Yes.
21  Q Okay. Because I take it at some point
22    in time this form would have existed
23    with just the Spanish teacher's
24    checkmarks on it, or possibly just one
```

Page 118

...

Page 119

1   elsewhere. Yes.
2   Q   Did you make a determination that
3       Fessenden did not have the resources to
4       serve Henry?
5   A   Yes.
6   Q   And are you telling me that this is
7       something the Fessenden School only had
8       occasion to detect in the second year of
9       Henry's education?
10          MR. SCAMBY: Objection.
11  A   I don't know.
12  Q   Well, you're an experienced teacher with
13      special education experience. The
14      problems Henry had in your class, is it
15      conceivable to you that he wasn't
16      evidencing any of those problems in the
17      first grade?
18          MR. SCAMBY: Objection.
19  A   He was experiencing problems in the
20      first grade.
21  Q   Was he experiencing problems of the
22      magnitude -- since you went back and
23      reviewed his record and everything, was
24      he having problems of the magnitude or

Page 120

1   similar magnitude as he was having in
2   your grade?
3   A   Not behaviorally.
4   Q   I thought you said behavior wasn't an
5       issue for you in the second grade.
6           MR. SCAMBY: Objection.
7   A   No, I never said that.
8   Q   You're saying his behavior was a factor
9       in your recommendation that he not be
10      promoted to third grade?
11  A   The question that you had asked me in
12      first grade I think was more
13      behaviorally based. This is based
14      solely on his academics.
15  Q   No. What I'm asking you now is, is it
16      conceivable to you as an educated
17      teacher that somebody could be having
18      the academic problems Henry was having
19      in second grade and not have had those
20      same problems in the first grade?
21          MR. SCAMBY: Objection.
22  A   I don't think so. I think it would have
23      started in first grade.
24  Q   In fact, do you have any idea what the

Page 121

1   cause was of Henry's poor academic
2   performance in your grade? Do you know
3   what the root cause of it was?
4           MR. SCAMBY: Objection.
5   A   No.
6   Q   Does he have a learning disability of
7       some sort?
8   A   I think he may. But I'm not a doctor to
9       determine that.
10  Q   Well, you know from your public school
11      experience that learning disabilities
12      are not determined by doctors, they're
13      determined by teams of educational
14      specialists. Correct?
15  A   I guess.
16  Q   It's not a diagnostic, it's an
17      educational determination. Correct?
18  A   I guess.
19  Q   And what I'm asking you is, did the SST
20      on which you participated for Henry
21      determine that he had a learning
22      disability.
23  A   I guess, yes.
24  Q   What was the learning disability that

31 (Pages 118 to 121)

```
 1       the SST determined he had?
 2    A  That I -- I don't know. I don't
 3       remember.
 4    Q  Are you familiar with the fact that
 5       there have been numerous children at
 6       Fessenden that have flunked courses at
 7       Fessenden and have not been held back or
 8       non-renewed?
 9    A  Yes.
10              MR. SCAMBY: Objection.
11    Q  What learning disability does John Doe
12       have?
13    A  That I don't know.
14    Q  Did the SST for John Doe make a
15       determination of what they thought the
16       disability was?
17    A  That I don't know.
18    Q  Do you recall being told in Henry's case
19       by anybody on the SST that he had
20       Asperger's Syndrome?
21    A  Yes, they think they thought he may
22       have.
23    Q  Well, it wasn't they. It was one person
24       in particular who expressed that belief.
```

Page 126

1   that without some kind of intervention
2   he's likely not to succeed academically
3   with a regular educational classroom
4   curriculum. Isn't that a fact?
5        MR. SCAMBY: Objection.
6   A  I guess.
7   Q  I guess I'm having difficulty
8   understanding what you're telling me.
9        Did you explore all avenues
10  to determine what needed to be brought
11  to the table for Henry to ensure that he
12  could succeed at the Fessenden School?
13  A  I feel as a team we did.
14  Q  And you're saying that whatever Henry
15  needed Fessenden was not able to
16  provide?
17  A  Yes.
18  Q  And what was it you thought Henry needed
19  that Fessenden couldn't provide?
20  A  I think more of a one-on-one, more of an
21  inclusion setting.
22  Q  You mean more of an exclusion setting.
23       MR. SCAMBY: Objection.
24  A  No, inclusion. Like, inclusive setting.

Page 127

1   Q  A self-contained, one-on-one classroom
2   setting excluding him from his regular
3   educational classroom.
4   A  Yes.
5   Q  You think that he needed to be
6   one-on-one educated.
7   A  Yes.
8   Q  Okay. And are you familiar with the
9   fact that the skill center professes
10  that it can provide that to a student at
11  Fessenden?
12  A  Yes.
13  Q  Okay. And when you proposed that to the
14  members of the skill center as being the
15  most appropriate course for Henry, what
16  was their response?
17       MR. SCAMBY: Objection.
18  A  Can you rephrase that.
19  Q  Surely you recommended to those in
20  charge, --
21       MR. SCAMBY: Objection.
22  Q  -- Wendy Pearre and skill center folk,
23  that they consider putting Henry into
24  the skill center full time. Didn't you

Page 128

1   make that recommendation?
2        MR. SCAMBY: Objection.
3   A  What do you mean by full time?
4   Q  Well, you're saying that what Henry in
5   your estimation needed was a one-on-one
6   situation.
7   A  Yes.
8   Q  Did you suggest that to the skill
9   center, that they set that situation up
10  for Henry?
11  A  Yes.
12  Q  And what did they say?
13  A  Yes.
14  Q  That they would do so?
15  A  Yes.
16  Q  And up until that point Henry had only
17  been visiting the skill center four
18  times. Is that correct? Four times a
19  week.
20  A  Yes.
21  Q  And your suggestion was that he be
22  full-time in the skill center.
23  A  Yes.
24  Q  And you're aware that other kids at

Page 129

1   Fessenden have been full-time in the
2   skill center, are you not?
3   A  Um... I don't know. I don't know.
4   Q  Well, with respect to John Doe, was it
5   not your recommendation where he was
6   concerned also that he be full-time in
7   the skill center?
8   A  Yes.
9   Q  Isn't it true that that was arranged for
10  that child?
11  A  Yes.
12  Q  Okay. All right. So you are aware of
13  another child that has been given a
14  full-time regimen at the skill center as
15  a means of obviating whatever disability
16  was preventing the child from
17  progressing in the regular educational
18  classroom setting.
19  A  Yes.
20  Q  And you recommended the same for Henry.
21  A  Yes.
22  Q  Are you telling me you never heard the
23  response to your suggestion?
24  A  What do you mean I never heard?

Page 130

1  Q  Well, you made the same suggestion for
2     Henry. Clearly, you were expecting some
3     sort of response in making that
4     suggestion, were you not?
5  A  Yes.
6  Q  Okay. What did the rest of the SST team
7     say in response to that suggestion where
8     Henry was concerned?
9  A  We -- they've done what -- all they can
10    for him right now at this point.
11 Q  Are you sure that was the response?
12 A  That's what I remember. Not verbatim
13    but...
14 Q  Well, let's try to remember because it's
15    very important. Isn't it true --
16       MR. SCAMBY: Please don't
17    tell the witness what's important,
18    George.
19 Q  Isn't it true that when you made that
20    suggestion the initial response of the
21    team was they would look into that as a
22    possibility?
23       MR. SCAMBY: Objection.
24 A  I don't remember.

Page 131

1  Q  Do you remember anybody saying have you
2     discussed this with the Whites as a
3     possibility?
4  A  I don't remember.
5  Q  Had you discussed full-time skill center
6     support as an option for the Whites as a
7     possibility?
8  A  I don't remember.
9  Q  Isn't it fair to say that you would not
10    have suggested that to the Whites until
11    you had vetted the idea with the team?
12 A  Yes.
13 Q  Okay. And it's fair to say, then, the
14    best you can remember today is you
15    vetted the idea with the team, you just
16    don't recall at this time what the
17    response was from the team.
18 A  Yes.
19 Q  Other than at some point they said
20    that's not in the cards for Henry.
21 A  Yes.
22 Q  Okay. Do you recall what the reasoning
23    was as to why that was not in the cards
24    for Henry?

Page 132

1  A  I don't recall.
2  Q  Okay. Do you recall anybody saying that
3     the learning center wasn't equipped at
4     this time to do that?
5  A  I don't recall.
6  Q  All right. So you don't know one way or
7     the other.
8  A  Yeah.
9  Q  All right. Would it be fair to say that
10    it was after you understood, however,
11    that that full-time skill center option
12    was not in the cards for Henry that it
13    was then that you made your
14    recommendation that he not continue at
15    Fessenden?
16 A  Yes.
17 Q  Okay. I take it where John Doe is
18    concerned had they said the same thing
19    in response to your suggestion that John
20    Doe be full-time in the skill center,
21    you would have made the same
22    recommendation for him that he not
23    continue at Fessenden.
24 A  Yes.

34 (Pages 130 to 133)

Bramanti & Lyons Court Reporting, Inc.
TEL. (617) 723-7321

Page 198

1  Q  And you know from your experience as a
2  special education assistant that if
3  something is disability related and not
4  cognitively related it can be remediated
5  through educational interventions. A
6  kid can be put back on track. Yes?
7  A  Yes.
8  Q  If it's cognitive related, that may or
9  may not happen.
10 A  Right.
11 Q  And a different kind of intervention
12 would be needed.
13 A  Right.
14 Q  You never did make a determination in
15 Henry's case whether his educational
16 setbacks as you came to understand them
17 from first grade and as you witnessed
18 them in second grade were related to a
19 physical disability or a cognitive
20 disability. You never made that
21 determination. Correct?
22       MR. SCAMBY: Objection.
23 A  Yes.
24 Q  I'm correct.

Page 199

1       And, in fact, the SST never
2  made that determination either, did
3  they.
4  A  I don't know. I don't remember.
5  Q  Well, all you do remember is speculation
6  about Asperger's on the part of Jonathan
7  Goldberg.
8  A  Yes.
9  Q  And, in fact, you know that was never
10 definitively determined because you do
11 know Asperger's does require a medical
12 diagnosis, correct?
13 A  Yes.
14 Q  And Jonathan Goldberg has no
15 qualifications to make such a diagnosis,
16 does he?
17      MR. SCAMBY: Objection.
18 A  I don't know.
19 Q  He's a psychologist.
20 A  Yes.
21 Q  Does he have an M.D. to your knowledge?
22 A  Um... I don't know.
23 Q  Okay.
24 A  I believe so but...

Page 200

1  Q  But he told you that was a conjecture on
2  his part, correct?
3  A  Yes.
4  Q  Okay. And, certainly, he never got
5  permission from the parents to send
6  Henry out to a specialist for that
7  diagnostic purpose, correct?
8  A  I don't believe so.
9  Q  Okay. And you know the team never made
10 a collective determination that Henry
11 had ADD or ADHD, correct?
12 A  Yes.
13 Q  Okay. The team looked to you for a
14 recommendation of the best future for
15 Henry. Isn't that true?
16 A  Yes.
17 Q  Didn't you feel a little overwhelmed by
18 that responsibility?
19      MS. SCAMBY: Objection.
20 A  Um... I don't know if I felt
21 overwhelmed.
22 Q  You felt competent to make an
23 educational determination of Henry's
24 future when you didn't even know whether

Page 201

1  his educational setbacks were disability
2  related, cognitively related, or
3  possibly related to being abused by the
4  school?
5       MR. SCAMBY: Objection.
6  A  I don't know.
7  Q  I'm asking you. You didn't know any of
8  those three things, correct?
9  A  I think once the behavior was intact it
10 was -- from my own standpoint, I could
11 hone in more on the academics.
12 Q  Well, I understand. But you have no
13 idea whether the present academic state
14 you found him in once behavior was no
15 longer an issue was the product of prior
16 behavioral issues.
17 A  I don't know.
18 Q  Right. That's what I'm saying.
19      And, yet, you were being
20 relied upon by a team of people who had
21 more experience than you in determining
22 what was the best future course for
23 Henry.
24      MR. SCAMBY: Objection.

51 (Pages 198 to 201)

Bramanti & Lyons Court Reporting, Inc.
TEL. (617) 723-7321

4c8c5ea7-4ad4-43be-b7f1-503bea1099f0

Page 202

1  Q  Do you think that's an appropriate thing
2     for a school to have done and put you in
3     the position of doing?
4          MR. SCAMBY: Objection.
5  A  I felt it was a team effort. I didn't
6     ever feel it was solely just me.
7  Q  What other recommendations were being
8     made by other team members?
9  A  Um... That he seek another school to
10    help him.
11 Q  And you're saying they came up with that
12    all on their own?
13 A  I think we came up with that as we
14    discussed his progress throughout the
15    year.
16 Q  Do you know what the differences are in
17    Fessenden's ability to address a
18    behavioral educational setback versus a
19    cognitive impairment?
20 A  No.
21 Q  Do you know what tools they have to
22    differentiate between the two?
23 A  No.
24 Q  Do you know what set of interventions

Page 203

1     the skill center has to address a
2     behavioral educational setback versus a
3     cognitive educational setback?
4  A  I don't know.
5  Q  Do you know what interventions the
6     school has to address disability in
7     education?
8  A  I don't know.
9  Q  Do you know whether any of your team
10    members had that expertise?
11 A  I don't know.
12 Q  Well, you know Wendy's educational
13    background, don't you?
14 A  Yes.
15 Q  She has no experience in special
16    education of any kind. Isn't that true?
17 A  I believe so.
18 Q  You know Dan Kiley's background, don't
19    you?
20 A  I don't have it memorized.
21 Q  Is he a teacher?
22 A  Um... He doesn't teach.
23 Q  And hasn't for decades, if at all,
24    correct?

Page 204

1  A  I don't know.
2  Q  Do you know how long he's been the
3     assistant headmaster and not a teacher
4     at that school?
5  A  Many years.
6  Q  By the way, he's no longer assistant
7     headmaster.
8  A  Yes, I know.
9  Q  Was there a meeting yesterday concerning
10    that?
11 A  Monday.
12 Q  And he -- you were at that meeting,
13    correct?
14 A  I wasn't.
15 Q  Okay. Well, you heard about the
16    meeting.
17 A  Yes.
18 Q  How were you informed of his
19    resignation?
20 A  Um... Through one of my co-workers.
21 Q  Did it surprise you that he resigned as
22    assistant headmaster?
23 A  Yes.
24 Q  Why?

Page 205

1  A  I didn't see that coming.
2  Q  You hadn't heard of anything that was
3     leading in that direction before?
4  A  No.
5  Q  And then Peter Drake. Is Peter Drake a
6     teacher somewhere in his vast experience
7     as a head of school?
8  A  He may have been. I don't know.
9  Q  Did he ever offer any input at the
10    meeting that gave you the sense that he
11    had a cutting-edge education in special
12    education, or anything like that?
13 A  I don't know.
14 Q  Okay. Didn't you perceive yourself as
15    the only person on that team that had
16    special education experience?
17 A  Um... No. Because there's kids that are
18    there that have special needs that do
19    get assistance.
20 Q  But I'm talking about on Henry's SST
21    team, not other kids' SST teams.
22 A  I don't know if I perceived it like
23    that.
24 Q  Well, who else on the team did you think

52 (Pages 202 to 205)